We're here counseling Friends of Animals v. Kelley Fellner. Michael Harris The District Court labels them the cultural, the natural resources, and the social objectives. Now, two of those, the cultural and the natural resources, are handled very discreetly in the plan. They're primarily focused on two areas within the seashore. The cultural is at the William Floyd Estate, while the primary, and if you go back, and I know the government will probably dispute this, but if you go back and look at all of the record where the scientists are talking about what kind of natural resources damage is being done on the seashore, they're saying we've got to protect that sunken forest. And the plan does implement very discreet activities to protect both of them. They're going to remove all of the deer from both locations and fence them in to make sure that those deer don't repopulate those areas. What I think is missing from what happened below is we're not disputing. Well, this case isn't about those two objectives. This case is about the social objective, which is the ongoing perceived unwanted, I guess is a good way to put it, interactions between deer and humans within the dispersed communities on the west side of the island. Our concern is that the record doesn't support what is essentially the scapegoating of the deer up in the eastern side of the island, primarily in the Otis Pike Wilderness area. There's no rational connection in the record between the decision to both hunt and call those deer and achieving any of the objectives. Two of the objectives are taken care of through discreet action, and the third is primarily within the communities located further away on the western side. It's your position that the destruction of plant species that is discussed in this report is solely in the Sunken Forest and not in the Otis Pike Wilderness? So I will say this. So there is more than those two natural areas at play here. There are also a number of smaller natural areas on the western side. They're smaller, a few acres, six acres would be a large one. What I'll say is there's three things. If you go back and look at, you know, this is a long history of scientists looking at this. With the Underwood reports, first of all. I'm sorry. I thought I had a simpler question, and my question was, are you saying that the concern for vegetation species destruction is limited to the Sunken Forest, or did it also apply to other areas, including the Otis Pike Wilderness? I will say that the scientists in the SAT said that we're concerned about the vegetation issues in the Sunken Forest. We lack sufficient information if there are vegetation problems associated with deer elsewhere, but they uniformly agreed that there were no vegetation issues in the Otis Pike Wilderness area. There is site after site after site, from Underwood to the SAT to the interdisciplinary team, that they never even considered there to be an objective of dealing with deer within the wilderness area, not just at some arbitrary number like 20 deer per square mile. There is actually a citation in the second interdisciplinary team's notes that say even at 46 deer per square mile, we don't see any impact on the vegetation within the wilderness area. I think when you read these sets of notes from the SAT and the IDT, it's clear that they're focusing on, and the IDT notes are very clear, they're focusing on very specific, it'll say cultural issues, William Floyd Estate, natural resources issues, Sunken Forest, community issues, the social issues. And they again and again point to the fact that the deer on the eastern end of the island are not causing an issue. They have, the population has remained stable for more than three decades, and that that population is not causing any stress on the natural environment there. In fact, if you go and look at the SAT, the SAT and the IDT notes in the joint appendix, they are 1836, again at 2160, and at 2204, they say if in the future we see a problem in the wilderness area, we would assume that there would be some type of a new plan. It may be based upon this. It may, you know, follow from this. But it's not what we're doing here. That's not what we're looking at. I thought your complaint was that they used a density number for the whole seashore and not area by area. It's not necessarily that they are using a density number. That's not your complaint? I think it's associated with it because it allows them to. The language associated with it doesn't really help me. Okay. Some of your language in your papers says they should have used a density number in discrete areas, not the whole seashore. Is that right? That's correct. So is that your complaint or isn't it? Our complaint is that they're taking deer from the Otis Pike Wilderness Area, and there's no rational basis tied to any of those three objectives. The vehicle for doing that. You're concerned about some deer being killed. But in order to understand the defect in the EIS, we need to know what that defect is. It can't just be the end result. Right. It's got to be a procedural defect. And I think the procedural defect. So I'll try again. Is the defect that they used a seashore-wide density number? No. That's not the defect? It is not. That's the vehicle for the EIS. You're okay with that? Yes. 20 per square mile. If they're implementing that in areas where there is actual objectives to be met. Well, what do you mean implementing it? If it's a seashore-wide number, then it covers the whole seashore. Not according to the SAT. Well, that's what it means to have a seashore-wide number. Well, sure. But then you also have to remove deer from the community areas, and this plan doesn't do that. So this is the problem. And this is really clear. If you look at the joint appendix on page 151, there is no direct removal of deer within the communities where the social problems occur. There is no evidence that removing deer on the eastern side of the island is going to relieve the social impacts on the western side of the island. There's no connection. And that's the procedural defect, is that they have to provide a reasonable explanation of what they're proposing to do, removing deer within the Otis Pike wilderness area, how that is going to achieve the objectives set forth in the plan. Two of the objectives are being achieved by very discreet action. And what is the connection between deer in the Pike wilderness and the cultural issues that are happening down below? You are not attacking the use of 20 deer per square mile on a total seashore basis. Is that right? Right, because the number is arbitrary. It doesn't matter if it's zero. It's a number you don't like. Normally people come here and say we challenge arbitrary action. Are you saying it's arbitrary, but it's okay? We're not. That is not the problem. It really isn't. The number is not the problem, and the fact that it's seashore wide is not the problem. Is that right? The problem, right. The problem is, is that they've chosen to get you know, if you go back and look at the SAT, there is clear. They, excuse me, the IAD, when they talk about a seashore wide density level, it's under the heading community social issues. When they're talking about it, they're talking about implementing a seashore wide density level within the affected communities. They clearly state that they have no reason to remove deer from the wilderness area. So the scientists are seeing it as distinct, as the seashore wide being focused on addressing the community issues. It's not until we actually get to the final decision that all of a sudden we're going to start removing deer in the wilderness area. I don't understand what you said when you just said it's a seashore wide problem focused on one area. I just don't understand what those words mean. Well, whether that's true, and I apologize, I'm not trying to mislead the Court, but it's exactly what the scientific advisory team was trying to look at. They were trying to find a way to address these social issues, and by placing a limitation on the deer in those communities, they saw that as an avenue to at least reducing them. So the judge that rejected your claim, she thought you were complaining about a seashore wide density number. Was she wrong to think that? Yes. And I would just say we had no oral argument before there either, so. It's just the whole point of your claim. Well, again, I think that they're using the seashore wide density number as a vehicle in their final decision, contrary to the scientific opinions of their own experts, to implement this. Well, all right. If it's contrary to the experts, does that mean it shouldn't have been done that way? Listen, I don't want to be saying that I know exactly what I'm saying. It is contrary, and there's no connection between removing deer in the east and the objective sought on the western side. Do you want a different density number for the wilderness area? I don't think the scientific advisory team and the IDT are clear that there doesn't need to be any removal. You could set a density number, but that doesn't mean there's any reason to remove deer at this point. In the future, maybe they might say, as they said, we might, if there becomes a problem. Do you want a density number for the wilderness area? No. We do not. No. And can I just say one thing that might shed a little light on this and see what you feel? It's important that they're not removing deer in the communities. Even if you remove all the deer from the wilderness area, the problem deer, and it doesn't matter if there's 20 of them per square mile or one per square mile. This is what the IDT and the SAT were struggling with. The perceived problems with human-deer interactions can be caused by any number of deer. But where did the deer come from in the western communities? If you removed all the deer from the communities and there are still hundreds of deer roaming the island, don't new ones move in to take advantage of the free food and whatever else is available? The same reason that caused the first crowd to come west. Right. Well, we're talking about a very long history of deer migrating into the island, and so they migrated off the island over. That's not addressed by the scientists. But the scientists do say on the movement issue, we don't know if that's true or not. The limited data that they have is that the deer that are currently on the island have high sight fidelity. And that is why the SAT said over and over again, this is a critical data loss that we don't have to help us make the right decisions. Is the government required in this kind of situation to commission new scientific studies to learn all this data? No. Can they act on the basis of recognizing these are the known knowns and these are the known unknowns, and we're doing the best we can with the scientific information that's available today? The answer to that is very clearly presented in 4D CFR 1502.22. And that is they have to provide an analysis of the missing data, whether it's relevant to their decision, how the absence of that can be corrected, or if it can't be corrected, how it might affect the decision, what the unknowns might be proceeding without that data. They don't do that here. The district court, you know, gave us a burden of showing that it was fatal. And that's not the law. We don't have to show that the data is fatal to the plan, just that it was relevant. You said several times that the plan is contrary to what the scientific experts said. And I can't say I read through all of the notes of all of these meetings over all of the years that these folks were dealing with it. Can you point me to, like, what's the best place where there is even one expert, because I don't know that there is any report that purports to be the consensus of the scientific experts. Right. Where does somebody say, the one thing you don't want to do is shoot deer in the eastern part of the island? Sure. The SAT reports at 1836 and 2160. Hold on one second. Where are these in the record that we can find them? J.A. 1836 and 2160. Hold on. Give us the treat. And let me pull up our briefs. And, you know, those are, I'm sorry, those are broad sites. Those are to the reports. Those aren't pin sites in the reports. But those reports state unequivocally that they're not looking to remove. 13-what? So 1836, 2160. 1836. Hold on a second. So at the 2160 report. And what is it that we're supposed to find? There is also a- 1836. 2160. Joint appendix 2160 is the beginning of the report, right? And it says the interdisciplinary team has not identified problems with deer in the wilderness. At joint appendix 2251, the wilderness area does not have an issue. At joint appendix 2204, the current deer density of 67 deer per square mile is sustainable and expected to be unmanaged area of the land. They weren't worried about these deer. They're not part of the objectives. So I don't want to quibble over the seashore-wide number because the scientists were not looking at that applying in the wilderness. Perhaps it's as simple as them seeing the wilderness area as separate from where the seashore- Mr. Harris? You know, it's nice of you not to look in my direction because you might be asked to end your argument. But hold on one second, if you would. Sure thing. Can you just address a threshold concern of mine? What's your client's standing to challenge this plan? Well, we're a member organization where we have- Is there a direct injury here to the organization? No, we're relying upon a member. Is there injury to members of the organization? Yes, there are. We have numerous members that use the seashore, use it for summer, reside in the communities, oppose this, have participated. Did you present any evidence, including affidavits, in support of your client's standing? And it wasn't challenged. Okay. Thank you very much. Thanks very much. We'll hear further from you in due course. You've reserved one minute. Knapp? Good afternoon, Your Honor. May it please the Court, my name is James Knapp. I'm an assistant United States attorney in the Eastern District of New York. I represent the National Park Service and the superintendent of Fire Island National Seashore in this appeal. This Court should affirm the lower court's grant of summary judgment in favor of the government and its denial of summary judgment to the plaintiff because the Park Service's Whitetail Deer Management Plan environmental impact statement and the corresponding record of decision wholly comport with NEPA and the APA. I'm going to let you go on, but I want to have your response to this issue of standing. I take it you don't disagree that Friends of Animals has standing to challenge the plan? We do not contest that. That's, I think, a national organization with members in the Eastern District of New York and elsewhere. Plaintiffs from the beginning of this case have drawn inordinate attention to the social issue components of the plan when, as the Park Service set about to deal holistically with the issue of deer on the island, including forest regeneration and the dissipation of native vegetation, not only in the William Floyd Estate, not only in the Sunken Forest, but island-wide. And seeing as counsel has conceded the deer-wide density argument, I'll come to two major points that they've largely ignored both below and before this Court. Fire Island is mandated as a shall-hunt park by Congress in its enabling legislation. The Secretary of the Interior, Congress, mandated that hunting shall be permitted in this park. And secondly, that scientific research supports the notion that a deer density greater than 20 has a negative impact on forest regeneration, natural forest regeneration. And the Park Service erred on the upper end of that spectrum by adopting a deer density of 20 to 25 per square mile. And under its modified Alternative D, as set about to have an adaptive management strategy, so that if it's finding that it's meeting its goals, that it could revise the deer density number up or down on what they would be able to observe on the ground in terms of regeneration. I may have misunderstood something. I thought that Congress gave the Park Service discretion to allow hunting here. But what you just said was that it is mandated that hunting be allowed? It's a shall-hunt park, as the parlance is used in the Park Service. And — But has hunting been allowed all these years? Yes. Now, they haven't had a hunt. But this park is one of those parks where if the Park Service determined that it needed a hunt, this is a park where such activity would — Well, but that — okay. So maybe they're using — Well, I still just want to understand this. I had taken that the situation was for all these — though these many years, while the deer population has grown from the 1960s to the present, there was not, in fact, hunting going on, and that one of the issues that the Park Service was undertaking to decide is, among other things, whether they should allow a hunt during whatever is the normal New York State hunting season in the preserves of the National Seashore. Is that wrong? I mean, have they been violating some law, some enactment of Congress, to whatever extent? You say hunting is allowed, but they haven't had a hunt? I don't know what that means. A person can't just come on Fire Island and hunt. There was a sanctioned hunt in 1989 that was challenged in front of Judge Platt and Judge Weinstein. Allen v. Hodel is the case. And injunctive relief was ultimately denied by this Court, I believe, sometime in 1990. As I understand it, that's the only hunt that's occurred between then and what is prospectively could be — would be a hunt in the area, assuming the Park Service comports with New York State law, which is what the statute provides. But the Park Service has to make a decision as to whether it's going to allow a hunt. It's not in derogation of any statute. It is not. If it doesn't authorize hunting. No, nothing in the statute says every two years there should be a hunt of deer, no. But this is a park where if it determined it wanted or needed, in terms of resource management, to have a hunt, this is such a park. There are parks where you may not hunt. Okay, I understand that. And this is the process, this process that we are reviewing, is the process by which they make that decision, among other decisions, about management of wildlife. Yes. Okay. Wildlife, vegetation, that's — again, the plaintiff seems to focus on the social issue. There are many issues covered by this plan. And as the product of many, many years of research, study, meetings, it wholly comports with, I say, NEPA, because the process that was undertaken was an interdisciplinary process, as NEPA mandates and the regulations mandate. They did rely on a science advisory team that covered the gamut from botany to interactions between humans and deer, vegetation, forest regeneration. Everything that — all the resources that are — that one will find if you go out to Fire Island was studied, considered, and informed this plan over many years. And plaintiffs, again, focus strictly on, for some reason, that there are problem deer with members of the — with folks who might live in the Fire Island communities. Well, I mean, in fairness, Mr. Harris suggested that the social thing is in the Fire Island communities, the cultural thing, by and large, at the estate on the mainland. And then he says, and the concern for vegetation is exclusive to the sunken forest. That's not true. That's what I was going to ask you about. And can you cite me things that show that he is wrong? The Blue Point area and the talisman areas, which are on the eastern portion, if you will, of Fire Island, adjacent to the wilderness, vegetation studies were undertaken in those areas, and deer browse pressures were observed. That was in 2012-13. It's in the plan. I could point you to it momentarily. I'm sorry. Okay. That's at the joint appendix in 4058. And 320 — oh, I'm sorry, maps, which will show you where these various areas are, including with Blue Point and talisman being adjacent to having similar characteristics to the wilderness area, are found at the appendix at 326 to 332. Another question about the process and the record. As best I could make out, and I can't, again, say I've read all of these thousands of pages, the various reports, in quotes, of the scientific advisory team and so on seem to take the form mostly of minutes of telephone calls. And one person will say one thing and somebody else will say another. And in some cases there seem to be two different accounts of the same conference call somewhere in the record. Is there any such thing as a report of the scientific advisory team that draws conclusions and says this is our consensus and this is our recommendation? If so, where would I find that? There is a final report of the science advisory team, and that is — I can rely on that. In the record of decision, it's at 276 to 277 of the joint appendix. That's a reference to the final report? If I'm — That's a reference to the final report? — consensus, that's where we would look? That's where it refers to the final report? 276. 276 of the joint appendix is the overview of alternatives. Am I looking at the wrong thing? 276 into 277? Yeah. It's introduction and overview of alternatives. It's part of the record of decision. And I thought that emanated from the Park Service, not from the SAT. But, again, maybe I'm wrong. Overview of alternatives? Is that it? This is a section entitled alternatives to. It's a large record. Yes, it is. Yes, it is. So what is it that you think page 276 tells us? Why don't you go to the microphone? Go to the microphone. And she should feel your — 2462, second full paragraph. The 20 deer per square mile target would apply island-wide and is based on the science team's best professional judgment. Sorry, what page are you on? 2462. Oh, 2462. Thanks. Which was informed by the Allegheny Forest study that said anything more than 20 deer per square mile inhibits a naturally regenerating forest. I see I'm out of time. Are there more questions? Take one minute and wrap it up. Judge Newman has a question. If this plan goes into effect, is there a determination of compliance at a certain interval? Annually. There are deer counts conducted annually. So at the end of year one, there will be a determination as to whether the seashore-wide 20 or 25 per square mile has been met. Is that correct? Yes. And if the hunters go into the wilderness area, well, first let me — the wilderness area is where there are lots of deer, right? More than in the towns. They are fairly equally distributed. I can tell you — Equally distributed throughout the seashore? At Page, there was a 36 deer per square mile in the Fire Island Wilderness as of 2013. It's not a part of the record, but the Park Service gave me the count numbers through last year. And as of 2018, the density per square mile is 53. Ninety-one deer is what the count was in the wilderness area. There may be anywhere from 300 to 500 deer on Fire Island as a whole. You're referring to — How many miles? 26-mile stretch. The wilderness is about — It's about five square miles, I thought. Five? Well, I'm looking at — look, at Page 176 — This is like a joke of some sort. Go on. At Page 176 of the Joint Appendix, in the record of decision, Page 30, okay, there are numbers for deer density. Correct. And it has a chart. And it lists the deer density per square mile of various different areas, and it gives the habitat area in square miles. And it comes to, if you add up all the numbers for habitat area — Now, maybe this isn't the totality of the national park. I don't know. It's just under five square miles. And the number of deer, if you add up the number of deer that's on that chart, it's about 400. So that would suggest that in this chart, the deer density per square mile is something like 80. And, indeed, there are some areas, like Sailor's Haven, Sunken Forest, that have 112 deer per square mile. In the pines, it's 165 per square mile. That's because they're very small areas. There aren't that many deer. And so on. And in some other areas, there are only 33 per square mile. So that's kind of the chart that — the only chart that I was able to find that summarizes this. The short answer to your question is that the habitat areas, that's not the sum total of Fire Island proper. I see. It's snippets of particular areas. These are particular areas. Are the number of deer in the wilderness area per square mile higher than in the populated areas? It depends on the populated area. But I would submit — I believe the answer is no. It's not higher than one community versus another. Here are this chart. It's 36. In the wilderness area. Yes, in the wilderness area. The answer is the density number — It's in the highly populated area. It's not the same. That's what I'm trying to get at. Is it higher in the wilderness area? It either is or it isn't. I don't think that's a hard question. I think it is not. You don't think it's any higher in the wilderness area? The density in the wilderness areas of last year was 53 per square mile. And what is it in the most populated part of the seashore? I can't tell you what the most populated area of the seashore is, but one community is Kismet-Lonelyville, which is a third of a square mile, and the density is 350 per square mile, with an actual deer count of over 100. That's one community. Well, all right, let me put it this way. If you stay with your seashore-wide density and the hunters go into the wilderness area and they kill 100 deer in the wilderness area, will that do anything to relieve the problem in the densely populated areas? No. No, not at all. And is it that why in their brief, even though they've run away from it here, I don't know why, but in their brief they said you should have used an area density number. And, indeed, many public comments urge that. Isn't that true? The record supports that, yes. Supports that. And that's one of the things you decided not to do, right? In its discretion, the Park Service determined to manage the entire expanse of Fire Island at one seashore density level. The reason you gave was lack of data. Isn't that true? No. That's not true? I'll read you. This is under the topic area-specific target deer densities. Public comments were received suggesting that the National Park Service should use area-specific deer density targets. Okay? That's the first sentence. Then it says, however, the idea was dismissed for lack of site-specific information. That's what the report says. That's why you didn't. Now, maybe that's a good enough reason. Maybe it's not. But there's no sense saying that's not why we dismissed it because the report says that's why you dismissed it. I submit that there were many factors considered. That's not the only one. Well, that's the only one given in the paragraph on getting rid of area-specific target density. There may have been other unstated ones. I think the record also supports. Maybe that's the procedural defect, too. You rejected it for unstated reasons. One consideration that can be found, I can't give you the site, is that the Park Service didn't want to have to do an environmental impact statement for each individual segment of the park. No one in this case asked you to do that. No. Well, that was a consideration as to why they might — they rejected site-specific deer density levels. It might be, but it isn't the one they gave. So don't tell me it might be the reason. Sure, anything might be the reason. You're limited to the record, aren't you? It's in the record, Your Honor. It's in the record? It is. And that's why they didn't do target — area-specific target densities? It's one of the reasons. Are you going to tell me which section of the report I'll find that? Yes. Which one? May I sit down to look? Sure. Mr. Harris, you might as well start winding up. No, not yet. But, I mean, getting ready. Warm up. Warm up. You're going to have one minute. If I can't find it before Mr. Harris wraps up, may I make a supplemental — Sure. No, the simple thing is you can submit a supplemental letter brief, no more than two pages, double-spaced, done electronically by the end of business tomorrow, and Mr. Harris will have an opportunity 24 hours later to submit whatever he thinks is appropriate by way of response. It is so ordered. Thank you. Mr. Harris. I've always been against the shore-wide density. I think it's important to understand. We do agree — so the SAT, the SAT, they did not propose a shore-wide density. They always proposed doing it site-specific. Our concern, of course, is that by doing it that way, they have opened up the wilderness area to removal of deer at high levels and numbers, way beyond what hunting would be if you just did limited hunting there, in order to achieve a shore-wide density level that has no rational connection to the objective of reducing the impacts in the communities. And that is what we're really concerned about here. If they would have done it through a different vehicle but still authorized the killing of the deer in the wilderness area, we would still be objectionable to it. It's just that they rejected — they flatly rejected the SAT's recommendation, which is at JA2313 through 35, recommends — it never recommends doing a shore-wide density level as a means to achieve any of the objectives, only doing it on an objective-by-objective basis. That's what I thought you wanted and asked you probably a half hour ago, and you, quicker than deer, ran away from it. I apologize. No, we're not urging that. I apologize. You are urging that, right? We want location-by-location, objective-by-objective, because that — I would just, as a final word, if you look at our opening brief on 41 through 45 — excuse me — and our reply brief at 5 through 8 and 12 through 13, site after site after site after site, there's no problem in the wilderness. There's no problem in the wilderness. There's no problem in the wilderness. This isn't just like, should we hunt in the wilderness? This is putting the deer in the wilderness front and center for problems that are happening elsewhere. And the SAT never thought that was a good idea. The IDT never thought that was a good idea. Thanks very much. All right. Thank you very much.